Waitzfelder *v.* Kahnweiler.

Waitzfelder and others *vs.* Kahnweiler and others.

Where the agreement of which a promissory note forms a part, or to which it relates, is void, the note cannot be enforced.

Thus where a promissory note was given for money advanced to the makers to be illegally invested in the purchase in the English market of uniform clothing, to be shipped to one of the Confederate States then in rebellion and waging war upon the United States, in violation of the foreign enlistment act of Great Britain and her neutrality laws, and in violation of the law of nations; and which money was used in such purchase, and the goods sent to Nassau, to be there shipped to Georgia through the blockade; *Held* that an action upon the note could not be maintained.

After the close of the war, the parties to such note had interviews in reference to their accounts, in one of which the makers promised to pay whatever remained unpaid upon the note, after the allowance, by the holders, of certain credits claimed; but such promise was not perfected or made absolute by the allowance of the credits. *Held* that the consideration upon which the promise rested not having been performed, the promise acquired no vitality,

Waitzfelder *v.* Kahnweiler.

so as to render the makers liable to pay the note, or the amount for which it was given.

At the time such promise was made, the defendants demanded an order for one half of the clothing which had been made, under the contract, but had not been delivered. An order was given, and presented, but not honored, in full; the plaintiffs having countermanded it, on the defendants' neglecting to pay the note. Subsequently, the plaintiffs revoked the countermand, and advised the defendants of it. There was no proof that the defendants, on receiving the order, and in consideration thereof, promised to pay the note; the promise to pay, and the demand of the order, though forming a part of the same interview, being different incidents. *Held* that the justice, at the trial, was justified in deciding that no new arrangement had been made and carried out which purged the original transaction of its turpitude.

APPEAL by the plaintiffs from a judgment of nonsuit.

The plaintiffs, as partners in business, sued the defendants as partners, on a promissory note, amounting, with interest, to £2111 9s. 9d. sterling money, the equivalent of which, in the lawful money of the United States, is $15,329.38.

The defendants, for answer, set up two distinct defenses. 1. That the consideration of this note was money loaned and advanced to the defendants, to be illegally invested in the purchase in the English market of *uniforms, clothing and army goods,* to be shipped to the *State of Georgia,* then in *rebellion,* and waging war upon the *United States of America,* in violation of the foreign enlistment act of Great Britain, and her neutrality laws, and in violation of the laws of nations. That said money was so used, the goods being purchased and actually shipped in pursuance of said agreement. 2. That the plaintiffs have received from the State of Georgia a large amount of money in return for such goods, exceeding in amount, as the defendants believe, the sum of $16,000, which amount the defendants will counter-claim, &c. The plaintiffs replied, denying the counter-claim of the defendants.

The facts, as claimed by the respondents, are as follows: Messrs. Kahnweiler, the defendants, in 1864, the time when

the contract hereinafter alluded to was made, were residents of the State of North Carolina, and Mr. S. B. Kahnweiler, who managed the whole business, was a resident of the United States, and a naturalized citizen thereof. The plaintiffs do not swear that they were residents of Great Britain, although they seemed to be in London during the continuance of the rebellion, as the special agents and the representatives of the State of Georgia. The plaintiffs had a branch house who represented them at Milledgeville, Georgia, and another at Nassau. The senior member of the Georgia house has resided in the South for twenty-five years, and the three houses acted together in representing the State of Georgia during the rebellion, and furnishing that State with the "sinews of war." The head partner of the London house (one of the plaintiffs) admits he furnished goods to the State of Georgia prior to the contract hereinafter mentioned, and was also a seller of Confederate bonds. It nowhere appears that the plaintiffs were permanent residents of Great Britain. On the 19th of September, 1864, one of the defendants, David Kahnweiler, obtained, by correspondence, a contract with Governor Brown, of Georgia, through Hershel V. Johnson, to furnish 5000 uniforms for the Georgia State troops. The defendants, who are the firm of Kahnweiler & Brothers, being desirous of having some assistance in carrying out this contract, entered into negotiations with the plaintiffs, (at that time representing the State of Georgia in England, as before stated,) and finally signed a written agreement with them, which agreement provides, in express terms, that said contract with Governor Brown shall be carried out on joint account between the plaintiffs and defendants. In pursuance of this agreement, the parties to this action, acting on joint account, purchased and shipped the uniforms called for by the original contract. By the testimony of Governor Brown, taken under commission, it appears not only that the con-

Waitzfelder *v.* Kahnweiler.

tract with Kahnweiler for the 5000 uniforms was made, and in fact carried out, but that the uniforms were for Georgia troops, actually in the Confederate service. It further appears that the buttons on these very uniforms were marked with the letters " C. S. A." On the 7th of March, 1865, the plaintiffs executed a receipt to the defendants for the note in suit, wherein it is recited that said note was for the defendants' share due the plaintiffs " for amount paid for contract filled on joint account for State of Georgia." It also appears by the defendants' testimony, that the consideration of the note arose out of the joint account transaction. Shortly after these transactions, the Southern Confederacy collapsed, the joint account in question was unadjusted, and ultimately the plaintiffs came to New York to reside, and brought suit in a state court to enforce the payment of said note.

The cause was tried on the 2d of March, 1868, before Justice Balcom and a jury. After the evidence was closed on both sides, on motion of the defendants' counsel, the court nonsuited the plaintiffs on two grounds: (1.) That the note in suit was given in a transaction between the parties, by which the parties were giving aid and comfort to the enemies of the United States during the rebellion, in 1864 and 1865, and for that reason the courts of this state will not enforce the payment of the note. (2.) That no new arrangement has been made and carried out between the parties, which purges the original transaction of the turpitude which induces the court to refuse to enforce the payment of the note.

*Wheeler H. Peckham,* for the appellants.

I. The agreement between the plaintiffs and defendants is unobjectionable, unless the original agreement between the defendants and Governor Brown of Georgia was invalid. The defendants claim that the agreement between them and Governor Brown was void. That agreement,

the court will specially notice, was a mere agreement of the defendants to *sell and deliver in Nassau,* and by the Governor to receive and pay for in Nassau, certain uniforms. Those uniforms may all have been in Nassau, or all have been to be made in Nassau, so far as the defendants and the governor were concerned. There was no contract or agreement between them as to transportation. It was a simple agreement by a neutral to sell and deliver in the neutral's own country to a belligerent, goods contraband of war; and the question to be decided is, would our courts now enforce payment of the price against Governor Brown were an action brought for that purpose? If they would, there can be no question of the validity of the contract between the plaintiffs and defendants.

II. The original agreement between the defendants and Governor Brown was valid and binding, in perfect accord with the law of England, of the United States and of nations. Citizens of foreign nations may lawfully sell to citizens of a belligerent power, or to the power itself, war material and goods contraband of war. (3 *Kent's Com.* 267, 268, *marg. Seton* v. *Low,* 1 *John. Cas.* 1. *Skidmore* v. *Desdoity,* 2 *id.* 77. *Juhel* v. *Rhinelander, Id.* 120 *; and in Court of Errors, p.* 487. *The Bermuda,* 3 *Wall.* 515; *and opinion of the Court, p.* 551.) There is nothing in our laws, or the law of nations, that forbids our citizens from sending armed vessels, as well as munitions of war, to foreign ports for sale. It is a commercial adventure, which no nation is bound to prohibit, and which only exposes the persons engaged in it to the penalty of confiscation. (*Per Marshall, Ch. J., Santissima Trinidad,* 7 *Wheat.* 340.)

III. A contract, valid and binding where made, is valid and binding everywhere. (*Story's Confl. Laws,* § 242.)

IV. The contract will be enforced in our own courts. 1. Where goods are sold by a neutral to a belligerent, to be delivered by the neutral in a blockaded port, the contract, though valid and not against the law of nations, will

not be enforced by the courts of the opposing belligerent, and the goods while on the high seas, are subject to capture by the opposing belligerent. The same rule applies if the goods are contraband of war, though shipped to a port not blockaded. 2. But if the neutral sell and *deliver* the goods in his own country, not agreeing or attempting to deliver them in the belligerent country, the contract is not only valid, but the goods in transportation from one neutral port to another are not subject to capture, and the contract will be enforced in the courts of the opposing belligerent. In *The Bermuda*, (3 *Wallace*, 553–5,) it is said : "It makes no difference whether the destination to the rebel port was ulterior or direct, nor could the question of destination be affected by transshipment at Nassau, if transshipment was intended, for that could not break the continuity of transportation of the cargo." "A transportation from one point to another remains continuous so long as intent remains unchanged." (*Id. p.* 553.) "If there be an intention *to send* the goods forward to an unlawful destination, the *continuity* of the voyage will not be broken," by transshipment, &c., (*p.* 554.) And the right of a neutral to sell contraband of war, to either belligerent, and to carry between its own ports for that purpose, *free* from liability to capture, is expressly recognized, (*pp.* 551, 552.) In *The Peterhoff*, (5 *Wallace*, 59,) the court says : "It is true that even these goods" (contraband of war seized on a voyage to Matamoras) "if really intended for sale in the market of Matamoras, would be free of liability, for contraband may be transported by neutrals to a neutral port, if intended to make part of its general stock in trade." Now the facts of the case show : 1. A contract of the defendants with Governor Brown to deliver him 5000 suits in Bermuda. 2. A contract by the plaintiffs to send to Bermuda similar goods. The plaintiffs or defendants were to have nothing to do with *sending* beyond Bermuda. The case is

precisely the same as if one of two partners, residing and doing business in Nassau, sells to a belligerent, deliverable there in Nassau, certain merchandise, and then writes to his partner, resident in London, to forward the goods to him—such goods, *en voyage,* would not be liable to capture. They belong to the shipper; are not yet delivered; on arrival he may deliver them, or others, or none, and the vendee could not take them, or claim any interest in them. (*Ludlow* v. *Bowne,* 1 *John.* 1. *See opinion, De Wolf* v. *N. Y. Ins. Co.,* 20 *John.* 225; *affirmed* 2 *Cowen,* 56.) 3. The mere knowledge that the *purchaser* intends to use them unlawfully in carrying on war, &c., does not affect the contract, as we have seen in *The Bermuda,* (3 *Wallace,* 551, 552.) The illegal act is not the selling in Bermuda, but the *transportation to the belligerent port;* if the vendor had nothing to do with that, his contract is free from taint. *Knowledge* of the vendee's unlawful intent does not taint. The principle is illustrated in other cases: Where a Frenchman, in France, sold goods to an Englishman, for the known purpose of being smuggled into England, it was held that the Frenchman could sue for the *price in England,* upon the ground that the sale was complete in France, and that the vendor had no connection with the smuggling transaction. (*Holman* v. *Johnson, Cowp.* 341.) A sale of lottery tickets in a state where it was lawful, the vendor knowing that the vendee intended to sell them again in a state where the sale of them is unlawful, gives the vendor a remedy in the courts of the latter state. (*McIntyre* v. *Parks,* 3 *Metc.* 207. *Pellecat* v. *Angell,* 2 *Cromp., Mees. & Rosc.* 311. *Story's Confl. Laws,* §§ 251, 252, 253.) So here we sold and delivered in Nassau, our own port. Our mere knowledge of the intent of our vendee to use them unlawfully, does not impair our right of action. (*Tracy* v. *Talmage,* 14 *N. Y. Rep.* 162–169 *to* 176, *and* 210 *to* 218. *Curtis* v. *Leavitt,* 15 *id.* 15, 164, 182, 236.) In *Tracy* v. *Tallmage,* this question was most exhaustively con-

sidered by Selden, J., and on motions for reargument, by Comstock, J., and the principle for which we contend conclusively established. In *Curtis* v. *Leavitt* it was reaffirmed. We challenge a reference to a single line of evidence showing anything more than the merest naked sale and delivery *in Nassau* by the defendants or plaintiffs to Governor Brown. True, the defendants plead that the goods were sold " to be " forwarded, and " to be" used in Georgia; but the evidence fails to support, in the slightest degree, the idea that how the goods were to be used was in the slightest degree an element in the contract. And in the case of *Tracy* v. *Talmage*, (*supra*,) and especially on the motion for reargument, it is most distinctly held that a contract is valid notwithstanding knowledge by vendor of the illegal intent of the vendee as to the disposition of the thing sold, unless the fact that it should be so used, entered into and formed an element in the contract. (14 *N. Y. Rep.* 213, 214.) See especially the illustration as to money lent for gambling, p. 214. Can it be pretended in this case, on the evidence, that the vendors had any other purpose or intent or interest than the mere sale of their goods—an ordinary business transaction?

IV. After the war was over, the defendants, for the consideration of the delivery to them of one half of the goods in Nassau, that had not been delivered to Governor Brown, promised to pay the amount. This contract is valid in two aspects. (*a.*) As a mere new promise of the original promise, it is valid as made at a time when the war had ceased, and the contract consequently ceased to be unlawful, even in respect to our laws, and when the moral obligation of the old contract is sufficient consideration. (*Hannay* v. *Eve*, 3 *Cranch*, 249, *opinion of Marshall, Ch. J.*) " If the allegations of the bill had stated any contract subsequent to the condemnation, by which Capt. Eve had made himself a trustee, the previous moral obligation might have furnished a sufficient consideration for that

contract." The principle is familiar in respect to infancy, usury, statute of limitations, &c. (*Story on Bills*, § 182.) We only cite the above as showing that it applies to cases of this kind. (*b.*) On the ground that it was an entire new contract, having no connection with the old, and supported as to consideration by the delivery of the order for the goods. (*Faikney* v. *Reynous*, 4 *Burr.* 2069. *Petrie* v. *Hannay*, 3 *Term. Rep.* 418. *Story on Conflict Laws*, §§ 248, 249, 250. *Armstrong* v. *Toler*, 11 *Wheat.* 262, 268, 269.) In *Faikney* v. *Reynous*, the plaintiff and one Richardson were jointly concerned in certain illegal transactions which resulted in a loss; plaintiff paid the whole loss, and took a bond from Richardson and the defendant Reynous, for Richardson's share. It was held by Lord Mansfield and a full bench, that the plaintiff could recover on the ground of a new contract. The other cases above are similar. Most of the cases on this point are collected in *Armstrong* v. *Toler*, (*supra*.) The evidence in this case establishes such a subsequent contract. The court below held that this new arrangement did not purge the original transaction of its turpitude. The decision of the court was a nonsuit on the whole evidence. In discussing its correctness we have a right to assume every question of fact as strongly in our favor as the jury would be warranted in finding, i. e. every fact as to which a verdict so finding would not be reversed as against evidence. Now, if it be claimed by the respondents that this new arrangement was not fully carried out, as seems to have been in the mind of the court, and that the plaintiffs revoked the order for the goods, there are two answers: 1. On the evidence, it was, to say the least, a fair question for the jury whether the revoking order was not itself revoked so soon as complained of. If a fair question for the jury, we have a right on this motion for a nonsuit to assume it in our favor; if we so assume it, then the new arrangement was fully carried out. 2. If not carried out, that simply constitutes a breach of the

new arrangement or contract. It in no way revives the alleged taint of the old contract. So soon as this new arrangement was made, it was a full, complete contract. The plaintiffs gave a delivery order for the goods; the defendants agreed to pay this sum. That was a new contract, *finished, completed.* Is it not idle to say that a failure by one party to carry it out, could *unmake* it, absolutely avoid it, so as to revive the alleged taint that, by it, had been destroyed? Will courts seek to revive taints, rendering contracts technically invalid, against the honest equity of the transaction? (*c.*) On inspection, too, the so-called revoking the delivery order, is no breach even of the new arrangement or contract. The new arrangement was virtually a sale of goods for an agreed price, payable on delivery. The plaintiffs had delivered a delivery order; the defendants had not paid as they had agreed. The plaintiffs, by the alleged revocation, simply refused to deliver-without payment.

*Edward T. Bartlett,* for the respondents.

I. There was no such new agreement between the parties as to purge the original transaction of that turpitude which induces the courts of this State to refuse to sustain any action to enforce it.

1. Even if the original contract was not illegal and wholly void, the testimony shows beyond all question that the ruling of the learned justice, at the circuit, was entirely correct, and fully sustained by the evidence. It appears by the testimony of the defendant S. B. Kahnweiler, that the defendant had informed the plaintiffs that he would pay any balance due them on the joint account transaction, if they would allow him his proper credits from the State of Georgia. It appears, however, that the promise relied on was wholly without consideration, and made to the father of one of the plaintiffs. It further appears, that if the alleged new promise had any consider-

ation, it was that the plaintiff should credit on the note all the payments received from the State of Georgia, and also deliver to the defendants the goods in store at Nassau. The order in favor of the defendants for one half the goods on joint account at Nassau, was delivered to the defendants on demand, and was afterwards revoked by order of the plaintiffs. If this agreement on the part of the defendants was not illegal, it was nothing more than an executory accord; for the plaintiffs, as a condition precedent to payment by the defendants, were bound not only to deliver the goods on the Nassau order, but to render an account of payment from the State of Georgia, and apply the same on the note in suit. This they never did, although it appears from the testimony that payments were made on this contract. Also, that the plaintiffs received from £1000 to £1500 on damaged goods, which were part of this very contract. The whole case on this point goes to show that if the contract had been legal it would have been impossible for the defendants to pay the balance due until after a final adjustment of the account and proper application of credits. It is submitted, therefore, 1st. There was in this case not even an executory accord binding upon the parties, for the reason that the alleged promise was wholly without consideration. 2d. That if there was an executory accord binding upon the parties, the plaintiffs have failed to perform on their part, and the parties are consequently remitted to their rights on the original contract.

2. The foregoing argument is based entirely upon the theory that the original contract between the parties is valid. It is, however, submitted that the original contract is illegal and void. It is a contract which never had any life; it is *malum in se;* it violates every principle of public law and public policy, and is absolutely void. It would be a manifest absurdity to hold that the criminals who enter into an agreement which the law says is null and void, can by any subsequent act of their own concerning

the same subject matter, and looking to the carrying out of the same illegal transaction, breathe life and vitality into that which the law says never had any existence. This is illustrated by the familiar example of a debt secured by a usurious note. The taint of usury in that case affects all continuations, renewals, new securities, &c., given for such debt. (*Preston* v. *Jackson,* 2 *Stark.* 237. *Pickering* v. *Banks, Forrest's Rep.* 72. *Chapman* v. *Black,* 2 *B. & Ald.* 589. *Cappell* v. *Hall,* 7 *Wall.* 542. *Bridge* v. *Hubbard,* 15 *Mass. R.* 96. *Marsh* v. *Martindale,* 3 *Bos. & Pul.* 154. *Walker* v. *Bank of Washington,* 3 *How. U. S.* 62. *Powell* v. *Waters,* 8 *Cowen,* 685. *Reed* v. *Smith,* 9 *id.* 647. *Tuthill* v. *Davis,* 20 *John.* 285. *Jackson* v. *Packard,* 6 *Wend.* 415. *Steele* v. *Whipple,* 21 *id.* 103.) And many other American authorities. All the other authorities are uniform on the point that every subsequent agreement is void which seeks to carry out the original usurious transaction. Subsequent securities can only be rendered valid by purging the contract of the usury. In the case of usury, a loan at legal interest is valid, and the new security being for the carrying out of that part of the contract which is lawful, is a contract binding in law. But in the case at bar there can be no such purging of the original contract, for the reason that the whole subject matter of the contract is unlawful, and every obligation springing from it is absolutely void.

3. The new promise, if any existed, is not before the court. The action is on the original note, and not on the new promise.

II. The agreement between the plaintiffs and defendants, and the promissory note upon which this action is brought, and which was given in performance of the contract, are both void by the law of nations.

The argument under this point rests upon the theory that the plaintiffs were Englishmen, or permanent residents of Great Britain, and therefore to be regarded as *neutrals,* and judged by the law applicable to *neutrals.*

Waitzfelder *v.* Kahnweiler.

See opinion of Chase, Ch. J., in *Shortridge & Co.* v. *Mason,* (delivered at Raleigh, North Carolina, June 17th, 1867.) From that opinion, it appears that the Supreme Court of the United States has held that foreigners, in their intercourse with the insurgents, during the late rebellion, must be governed by international law as applied to the rights and duties of neutrals. It therefore being settled that the rebels were belligerents, as between the loyal people of the United States and foreigners, there is but one question under this point: What are the rights and liabilities of neutrals in the time of war ? 1. It is submitted that by the law of nations it is unlawful for a neutral to trade with a belligerent in contraband of war, and that any contract entered into between a neutral and a belligerent for that purpose is void, and the said contraband goods are subject to confiscation by either contending power against whom they were to be used. Says Vattel, in his Law of Nations, page 332 : "Let us therefore examine in what consists that impartiality which a neutral nation ought to observe : 1st. To give no assistance when there is no obligation to give it. 2d. Nor voluntarily to furnish troops, arms, ammunition, or *anything of direct use in war.*"

Vattel, in his seventh chapter, in which he treats of the rights of neutrals, lays down the law, from which no civilized nation has ever dissented, that a neutral may trade with a belligerent in all kinds of goods except commodities particularly useful in war, and known as contraband goods. Contraband goods are, however, subject to confiscation, and such seizure is deemed by the law of nations no insult to the nation from whence they came, for if the sovereign of the citizen offending undertake to protect him, such conduct would be tantamount to his furnishing the enemy with the goods, himself. ( *Vattel on Neutrals, ch.* 7. 1 *Kent's Com. lec.* 7.) In *Ludlow* v. *Bowne & Eddy,* (1 *John.* 3,) says Justice Tompkins : "It cannot be denied that a neutral may, without contravening any established principle of

the law of nations, carry on commerce with either of the belligerent parties, in the same manner and to the same extent, as in time of peace, except in articles contraband of war, *or to a blockaded port.*"

Says Mr. Justice Spencer, in the same case, at page 6: "By the law of nations a neutral has a right, with the exception of contraband goods, and going to a blockaded port to supply the belligerent."

2d. The contract in question, by its very nature, contemplated a violation of the law of blockade. Says Chancellor Kent: "A neutral may also forfeit the immunities of his national character by violations of blockade, and among the rights of belligerents there is none more clear and incontrovertible, or more just and necessary in the application, than that which gives rise to the law of blockade." Bynkershoeck says it is founded on the principle of natural reason as well as on the usages of nations; and Grotius considers the carrying of supplies to a besieged town or a blockaded port as an offense exceedingly aggravated and injurious. They both agree that a neutral may be dealt with severely; and Vattel says, "he may be treated as an enemy." (1 *Kent's Com.* 144. *See also Vattel's Law of Nations, p.* 339, *n.* 159.) It appears that the parties had full knowledge of the existence of the blockade, and that the uniforms furnished were to be used in the rebel army.

III. A contract founded upon transactions in violation of the laws of the United States can furnish no lawful cause of action, and the courts of this country will not enforce a demand so tainted.

It is immaterial that the plaintiff is a foreigner, or had no notice of the law, or of the facts on which it is to operate. (*Cambioso* v. *Maffet,* 3 *Wash. U. S. C. C.* 98.) The contract in question was in violation of the constitution of the United States, as the supreme law of the land, of the proclamations of the President of the United States estab-

lishing the blockade, and of certain acts of congress pro-
hibiting commercial intercourse, and therefore cannot be
enforced in the courts of this country. In the case of the
*Executors of Cambioso* v. *The Assigns of Maffet,* a bank-
rupt, (3 *Wash. U. S. C. C.* 98,) the law controlling this case
is clearly laid down. Cambioso and Maffet were jointly
interested in a number of vessels and cargoes shipped to
this country, upon which transactions distinct balances
are stated in favor of Cambioso and claimed by his ex-
ecutors in this action. Maffet was an American citizen
and Cambioso was a foreigner. Under laws of the United
States nothing could protect these parties from the payment
of alien duties, but an American register of the vessel.
This, however, could not be obtained, in consequence of
Cambioso being an alien. Maffet concealed the fact that
Cambioso was an alien, and obtained registry by perjury.
Under the register, a number of mercantile transactions
were carried on by M. & C., on which this claim was founded,
for a considerable balance, in favor of Cambioso. The
court held that a claim founded on a fraud of the laws of
impost and tonnage cannot be enforced in the United
States court, and the fact that the plaintiff was a foreigner
made no difference; his associate being a citizen of the
United States, charged him with a knowledge of the law.
Also, in the case of *Conlon* v. *Maybin,* (4 *Dall.* 298,) which
was a similar case, the court said: "No court of justice
in the United States can lend its aid at any time or in any
degree to recover a debt originating in a source so forbid-
den, so foul, and so pernicious." Also, in the case of *Dun-
cansen* v. *McLare,* (4 *Dall.* 308,) the court said: "Inasmuch
as the plaintiff's claim to the ship was founded upon a
transaction in fraud of the positive laws and public policy
of the United States, which excluded an alien from any
degree of interest in an American registered vessel," his
action could not be sustained for that reason. In *Wheeler*
v. *Russell,* (17 *Mass. R.* 281,) says the chief justice: "No

principle of law is better settled than that no action will lie upon a contract made in violation of a statute or a principle of the common law." (*See also Springfield Bank* v. *Merrick,* 14 *Mass. R.* 322; *Russel* v. *De Grand,* 15 *id.* 39. *Belding* v. *Pitkin,* 2 *Caines,* 149.)

In the case at bar, the defendant is a citizen of the United States, and clearly, within the principle above laid down, no contract made by him in violation of the law of the United States, or of public policy, either with a native of this country or a foreigner, can be enforced in the courts of this country.

IV. The note in suit is void as against public policy, and cannot be enforced in the courts of this country. 1. It would seem to require little argument to establish the above proposition. This point is, indeed, the main point in the case. Laying aside, for the purpose of this argument, the effect upon this contract of the law of nations, and the positive statutory enactments of the United States, we are met by the broad proposition that this contract cannot be enforced in the courts of this country, for the reason that the original agreement between the plaintiffs and defendants (reciting, as it does, that it is made for the purpose of carrying out, on joint account between the parties, a certain contract made by the defendants with Governor Brown, of Georgia, to furnish troops in active service against the government of the United States with uniforms,) is absolutely illegal and void as against public policy. The contract is not merely *malum prohibitum,* but, viewed in the light of public law and public policy, is *malum in se.* It would be difficult to name a contract which would be regarded by the courts of this country as *malum in se,* if the one under consideration is not just such a contract. Here two parties, one a citizen of the United States, deliberately affix their names to a written instrument wherein they agree to put their joint capital and services together in furnishing aid and comfort to the

enemies of the republic, at a time and under circumstances which characterizes the parties as guilty of one of the darkest offenses in the catalogue of crime. Both were aiders and abettors of traitors. The plaintiffs were violating every law of neutrality, and the defendants were committing the gravest offense that a citizen can commit—*treason*. And yet these parties come into the courts of this State, and presenting their past record, ask your honors to aid them in carrying out a contract which cannot stand for one moment in the loyal tribunals of this country. How much stronger is the case at bar than the ordinary cases with which the books are filled, of contracts void as against public law or public policy. In this case there was a direct attack upon the national life ; in other cases but a comparatively slight offense was committed in the violation of the ordinary statutes of the land, or the principles of public policy, yet in all these cases is the doctrine sternly enforced, that actions, founded upon such contracts, cannot be heard in the courts. (*Burt* v. *Place*, 6 *Cowen*, 431. *Daimouth* v. *Bennett*, 15 *Barb.* 541. *Staples* v. *Gould*, 5 *Seld.* 520. *Nellis* v. *Clark*, 4 *Hill*, 424. 30 *How.* 135.) The following authorities establish the point that contracts which are simply against public policy cannot be sustained. (*Fuller* v. *Dame*, 18 *Pick.* 472. *Hatzfield* v. *Gulden*, 7 *Watts*, 152. *Cleppingen* v. *Hepbaugh*, 5 *Watts & Sergt.* 315. *Wood* v. *McCarr*, 6 *Dana*, 366. *Hunt* v. *Test*, 8 *Ala. R.* 719. *Commonwealth* v. *Callaghan*, 2 *Virginia R.* 460. *Marshall* v. *Balt. & O. Railroad Co.*, 16 *How. U. S. Rep.* 314.) 2. This case is clearly within the principle laid down by the English authorities, and adopted by the Court of Appeals in this State in the case of *Tracy* v. *Talmage*, (14 *N. Y. Rep.* 162,) where, in passing upon the question of illegal contracts, it was held that the mere knowledge of the fact that the goods were to be used for an illegal purpose did not prevent the seller from recovering ; but he is prevented only where he takes an actual part in the illegal adventure.

Waitzfelder *v.* Kahnweiler.

(*Biggs* v. *Lawrence*, 3 *T. R.* 454. *Clugas* v. *Penaluna*, 4 *id.* 466. *Waymell* v. *Reed*, 5 *id.* 599. *Pellecat* v. *Angell*, 2 *Crom. Mees. & Ros.* 311. *Lightfoot et al.* v. *Tenant*, 1 *Bos. & Pull.* 551. *Cannan* v. *Bryce*, 3 *Barn. & Ald.* 179. *McKinnell* v. *Robinson*, 3 *Mees. & Wels.* 434.) In the last case Lord Abinger says: " This principle is, that the repayment of money lent for the express purpose of accomplishing an illegal object, cannot be enforced."

The application of this principle to the case at bar is clear. If the plaintiffs had simply, as Englishmen, sold any article of trade to some agent of the Southern Confederacy, with the full knowledge that it was to be used for an unlawful purpose, they would not come under this rule, (although such a contract could not be enforced in our courts;) but here the money was advanced on a contract for the express purpose of accomplishing what the courts of this country must regard an illegal object. There is no rule of law under which these plaintiffs can recover. This is a case where the parties stand *in pari delicto*, and neither of them are allowed to appeal to the courts for aid; the maxim *portior est conditio defendentis* must govern. This being a case where the contract is *malum in se*, the court will not interfere to relieve either party from any of its consequences. (*Tracy* v. *Tallmage*, 14 *N. Y. Rep.* 181.) In the case just cited, Judge Selden says: " The cases in which the courts will give relief to one of the parties, on the ground that he is not *in pari delicto*, form an independent class, entirely distinct from those cases which rest upon a disaffirmance of the contract before it is executed. It is essential to both classes that the contract be merely *malum prohibitum*. If *malum in se*, the courts will in no case interfere to relieve either party from any of its consequences. But where the contract neither involves moral turpitude nor violates any general principle of public policy, and money or property has been advanced upon it, relief will be granted to the party making the advance.

1st. Where he is not *in pari delicto.* 2d. In some cases where he elects to disaffirm the contract while it is executory." It is under the first class of cases that plaintiffs are allowed to recover by reason of statutes made for the protection of one class of persons against the fraud, oppression or chicanery of another class. (*Smith* v. *Bromley, Doug.* 670, *note.*) And under the second class the courts will aid parties in disaffirming a contract where it is not *malum in se.* The case at bar is clearly not within either class of cases where the court will grant relief, for two reasons: 1st. The contract is *malum in se.* 2d. The action is not to disaffirm the contract, but to enforce it.

V. If the main position in the case is well taken, it cannot be necessary to examine the exceptions interposed by the plaintiffs' counsel to the admission of evidence.

*By the Court,* BRADY, J. We held, upon the argument of the appeal herein, that the note in suit could not be enforced, because the agreement of which it formed a part, or to which it related, was void, and reserved the question whether the defendants had nevertheless, by a new and valid consideration, incurred the liability to pay the note, or the amount for which it was given.

The parties hereto were engaged in furnishing uniforms to the so-called Confederate States, and after the termination of the war, had interviews in reference to their accounts, which did not result to the satisfaction of the defendants, but in one of which the defendants promised to pay whatever amount remained unpaid of the note in suit, after the allowance by the plaintiffs of certain credits which the defendants claimed should be made. That promise was not perfected or made absolute by the allowance of the credits; and the condition upon which it rested not having been performed, it acquired no vitality. It appears, however, that at the time it was made, the defendants demanded an order for one half of the clothing which had

Waitzfelder *v.* Kahnweiler.

been made for the Confederate States, under the arrangement existing between them, but which had not been delivered. The order was given and presented, but not honored in full, the plaintiffs having countermanded it, on the defendants' neglect to pay the note. There is evidence in the case, that subsequently the plaintiffs revoked the countermand, and advised the defendants of it, although such notice is denied by the defendants. There is, however, no proof that the defendants, on receiving the order, and in consideration thereof, promised to pay the note. The promise to pay, and the demand of the order, though forming a part of the same interview, were different incidents. The defendants appear to have insisted that the whole of the note was not due, and to have expressed a willingness to pay whatever was due, after the application of credits which should be made to the account in their favor; and the demand of the goods appears to have been the exercise of a right founded upon the payment received by the plaintiffs on account of them, and the intention of the defendants to pay any balance relating to them which might exist. In other words, that the goods which were the subject of a joint enterprise, having been in part paid for by joint funds, were joint property, and not covered entirely by the advances of the plaintiffs.

For these reasons the justice presiding at the trial was justified in deciding that no new arrangement had been made and carried out, which purged the original transaction of its turpitude, and the judgment must be affirmed. These views expressed in reference and in response to the point made by the plaintiffs, render it unnecessary to consider whether such a contract as this case presents could be enforced, under any circumstances, in the courts of this State.

Judgment affirmed.

[NEW YORK GENERAL TERM, April 4, 1870. *Ingraham, Geo. G. Barnard* and *Brady,* Justices.]